KELLEY et al. v. CUNARD S. S. CO., Limited.

(Circuit Court, D. Massachusetts. January 6, 1903.)

No. 1,258.

1. SHIPPING—ACTION FOR FAILURE TO DELIVER CARGO—EVIDENCE OF RECEIPT OF GOODS.

Upon the issue whether goods claimed to have been shipped in a foreign port, but which were not delivered by the carrier, were in fact received on board, the acts of the ship's officers, whose customary duty it is to check off merchandise received aboard, is received as evidence of great importance.

2. SAME.

Evidence examined, in an action at law by a shipper against a steamship company to recover for failure to deliver cargo, and *held* such as to justify the submission to the jury of the question whether the merchandise in controversy was actually received on board defendant's ship. Smith v. Navigation Co. [1896] App. Cas. 70, applied.

At Law. On motion for new trial.

Whipple, Sears & Ogden, for plaintiffs.
Putnam & Putnam, for defendant.

PUTNAM, Circuit Judge. In this case there was a verdict for the plaintiffs for goatskins and kidskins alleged to have been shipped

from Naples to Boston by the defendant's steamer Tarifa. The voyage of this ship ended at Liverpool, where bulk was broken, and the merchandise brought from Liverpool to Boston by another vessel. The voyage from Naples to Liverpool was a part of a continuous shipment on defendant's alleged through bill of lading to Boston. The only question we have to consider is whether the merchandise in question went over the rail of the steamer Tarifa at Naples with the plaintiffs' marks thereon. The defendant maintains that it did not, and that sheepskins were substituted before the goods were delivered to the ship, so that, through the fraud of parties at Naples, to whom the plaintiffs are alleged to have intrusted them for shipment, effectuated before they were laden, sheepskins were substituted for the goatskins and kidskins owned by the plaintiffs, falsely marked with the tags which the plaintiffs had caused to be put on the latter while on the quay awaiting shipment.

It was conceded that at least a portion of the goatskins and kidskins belonging to the plaintiffs were laden aboard the Tarifa, though, as claimed by the defendant, when laden, they bore, through the fraud of the parties intrusted by the plaintiffs with their shipment, the marks of another consignee, to whom the defendant, being misled by the fraud, delivered the same. The court instructed the jury that, under the circumstances, unless the defendant received aboard the ship the merchandise which belonged to the plaintiffs, and with their proper marks on them, the plaintiffs could not recover. Consequently, the only question which we have now to consider is whether the jury properly found that the plaintiffs' goods went aboard the ship so marked.

This motion for a new trial sets out several reasons on which it is based; but the only one we need notice is that most favorable to the defendant, namely, that the verdict is against the weight of the evidence. Everything else in the motion is either an amplification of what is thus assigned, or claims that the evidence was conclusive in behalf of the defendant. In the latter event the defendant will, if its propositions are true, have relief under one of its requests for instructions to the jury, which was refused, as follows:

"There is no evidence from which the jury would be justified in finding that the goods described in the plaintiffs' bills of lading were delivered to the defendant on the steamship Tarifa as and for the goods of plaintiffs."

As an exception was taken to the refusal of this request, and as a proposition that the evidence is conclusive one way or the other raises an issue on which clearly an appellate tribunal may pass, the rights of the parties will be better secured, and the litigation sooner ended, by our refusal to consider such an issue on a motion for a new trial. Therefore, and because, also, as we have said, it is the most favorable view of the motion which can be taken for the defendant, we limit our observations and conclusions to the claim that the verdict was against the weight of the evidence.

One Rondino, who assumed to act as the agent of the defendant at Naples, gave what was apparently a bill of lading for this merchandise while it lay on the quay, and before the Tarifa arrived. It was agreed by the parties that one Ferolla was the agent of the

defendant at Naples, with authority to sign bills of lading "for the master," "for the transportation of merchandise delivered on board the steamships" at Naples, and that Rondino was Ferolla's clerk, with power to exercise his authority. So far as it appears, there was no other agent or representative of the defendant at Naples. The alleged bill of lading was in due form on a printed blank of the defendant. It provided, as other "line" bills of lading do, that merchandise might be forwarded by the steamer named in it, or by some other of the defendant's steamers. Therefore it was the view of the court at a previous trial that the terms of the bill of lading overruled the literal language of the agreement referred to, so that Ferolla, and Rondino as his representative, were authorized to give bills of lading for the company itself, and not merely for the master of any particular vessel, having in this respect the same authority as the agent of an express company, or railroad company, or of other ordinary land carriers. This fact was impressed especially on the court, because, in this particular case, the alleged bill of lading was given in advance of the arrival of any steamer, and named a ship other than that on which the merchandise was afterwards directed by the defendant to be laden.

Also, inasmuch as it was conceded that the defendant undertook to deliver at Boston the merchandise apparently called for by the alleged bill of lading, and collected the freight stipulated therein, it seemed to the court that it was not incumbent on the plaintiffs to prove the authority of the assumed agent who signed the alleged bill. One party to an apparent contract cannot accept the benefits thereof, and recognize it for certain purposes, and compel the other party, when seeking to enforce it in his own behalf, to prove the authority of the person who assumed to execute it as agent. Also, the court recognized the facts as stated by the court of appeals for this circuit in Pollard v. Reardon, 13 C. C. A. 171, 65 Fed. 848, that, while bills of lading are not negotiable instruments in the sense that promissory notes are such, yet they are negotiable, that "they are well recognized commercial instruments, that when indorsed in blank they carry title by mere delivery from hand to hand, and that the community gives credit and reliance on what appears on the face of them." Indeed, it was recognized by the court that, in the language of Lord Halsbury in Smith v. Navigation Co. [1896] App. Cas. 70, 75, bills of lading are a class of mercantile documents "which has a force and effect of its own, and involves the rights of persons other than those who execute them." The court understood that the practical rules with reference to bills of lading, although now extended to inland bills, had its origin with reference to foreign bills, precisely as the law with regard to promissory notes had its origin with reference to the goldsmiths' foreign bills of exchange. Bills of lading given in distant countries are given under circumstances as to which the holders may have, and sometimes can have, but little knowledge, while the transactions are usually, and, indeed, we may say always, under the eye of the owners of the ships, their masters, or other agents. Therefore, while the court recognized the fact that, so far as a bill of lading operates as a receipt, it may be explained, yet, in accord-

ance with the practical rules which have been applied in reference thereto, it understood that such a bill does not constitute a mere prima facie case, in the refined sense in which the term "prima facie" is used in the courts in New England, but that it casts the burden on the party issuing it, and claiming that goods were not received as stated in it, to prove his contention in a satisfactory manner and clearly. In other words, the court understood that the rule has always been practiced with reference to foreign bills of lading as is said in The Freeman, 18 How. 182, 192, 15 L. Ed. 341, namely, that the giver of a bill of lading is not estopped from "alleging and proving" the fact that the merchandise named in it was not in fact received aboard his vessel, and as it is also said in Carv. Carr. by Sea (3d Ed.) 80:

"The onus of falsifying the statements in the bill of lading is upon the shipowner."

The circuit court of appeals, however, in its opinion setting aside the verdict for the plaintiff which was taken·at the previous trial, observed as follows:

"The circuit court instructed the jury that the bills of lading were the bills of lading of the Cunard Company, irrespective of any direct evidence in the case as to the authority of Rondino, saying: 'The Cunard Company received the freight called for by them, and assumed to deliver the goods they described, and therefore it accepted the papers as its bills of lading.' In these instructions we find substantial error."

Consequently, at the present trial, each alleged bill of lading came in only as res gestæ, and, when the case went to the jury, it was left in such form by the apparent consent of both parties that the court was unable to instruct the jury that any had been given. Under these circumstances, the burden of proof clearly rested on the plaintiffs to show that their merchandise was received aboard the ship, properly marked, as we have stated. It is on this account, and only on this account, that any difficulty arises in the mind of the court growing out of the motion now under consideration.

It is necessary to refer to only a few facts in the case. It is entirely clear that the methods of covering and baling at Naples goatskins or kidskins on the one hand, and sheepskins on the other, are such that any person at all familiar with them would see at a single glance the difference between them, and would not confuse one for the other. It must be assumed that the officers of the Cunard ships, resorting regularly to the port of Naples, knew this; and it is difficult to understand how, if those officers were attentive to their duties, they could have been deceived with reference to the character of the merchandise received aboard the Tarifa. On the other hand, it is agreed by the plaintiffs that no substitution of the merchandise was made after the ship arrived at Liverpool. She was in Naples but a few hours, the hatches were seasonably secured after sailing, and for various reasons, to which the court need not refer, the court is unable to perceive how a substitution, which necessarily involves, not only a change of marks, but a removal of a portion of the merchandise, could have been effectuated in the harbor of Naples after the goods passed the rail of the ship. On the other hand, Rondino

testified in reference to the plaintiffs' merchandise. It is necessary to preface that one Garsin purchased the goods for the plaintiffs at Naples, and that, when the alleged bill of lading was given, and before shipment, the goods were at a quay in Naples known as the "Punto Franco." His testimony was this:

"Garsin was in a great hurry to get the bill of lading, which I would not issue immediately, without first having ascertained that the goods were at the Punto Franco. I went, in fact, to the Punto Franco, where the storekeeper pointed out the lot of skins. * * * I delivered the second bill of lading after I ascertained that the merchandise was deposited in the Punto Franco. * * * In conformity with the conditions embodied in the bill of lading, the merchandise was all loaded on the steamship Tarifa. * * * All this is perfectly true, and I can verify that, on the day when the 101 bales were shipped, 53 belonging to Mr. Garsin, 48 to Signor Salvini, I was present at the shipment, and made sure that these were really the goods deposited in the Punto Franco."

His testimony was in Italian, where he used, in lieu of the words "I was present," the word "assistetti"; but a witness, familiar with the English and Italian languages, translated this to mean "watching over." What is the correct translation was for the jury; but the testimony of the witness referred to was not contradicted, and the jury was not only at liberty, but probably was required, to find that Rondino was not only present at the shipment, but was vigilant with reference thereto, and thus personally made sure that the plaintiffs' goods went aboard the Tarifa. Of course, under the circumstances, his testimony that he made sure that the goods which went aboard the ship were really the goods deposited in the Punto Franco, included the fact that they went aboard the ship properly marked, and that they were goatskins or kidskins, because, otherwise, presumably as his duty required, he would have observed the difference in the packing and covering, and the falsification of the marks, and would, at once, have informed the master of the ship in reference thereto.

Furthermore, the subordinate officers of the ship, whose customary duty it is to check off merchandise received aboard a vessel and report the same to the mate, so that he may give proper receipts therefor, produced their books, and testified in such a way as to demonstrate that the plaintiffs' goods were received aboard the ship, properly bearing their marks, unless they were extremely inattentive and careless. Tallying off goods coming aboard ship, in the usual way, is, however, received as evidence of great importance with reference to defenses like that at bar, as was shown in Smith v. Navigation Co. [1896] App. Cas. 70, already referred to. That was a Scotch case, and came before the house of lords for the determination of the facts. It turned on a question of shortage of 12 bales of jute at Calcutta. It is true that there was in that case a bill of lading, but the lack of that at bar is more than compensated for by the testimony of Rondino. It also appeared that the bales as they came aboard were tallied in almost precisely the same way in which they were tallied in the case at bar,—in the one case from what were called "boat notes," and in the other from what are called "shipping notes." It also appeared that at all times, both day and night, there were watchmen

over the cargo, and that, on account of the warm weather, the crew slept on deck. It was said that, if an attempt had been made to remove a bale, the crew would have been disturbed. As soon as the cargo was put aboard, the hatches were put on, and no portion of it was removed until the ship reached her destination. There was also evidence that every available space was filled with cargo. In that case it was quite as difficult to understand that the cargo was tampered with after it came aboard the ship as in the case at bar; and yet the house of lords, as a matter of fact, decided against the shipowner. It is true that in an earlier case which came before the house of lords (McLean v. Fleming, L. R. 2 H. L. Sc. 128) the ship prevailed; but there the loading of the cargo was under such circumstances that it was impossible to systematically check it as is ordinarily done, and the discrepancy was so large that it was almost certain there was some mistake.

The improbabilities which the plaintiffs have to contend against in the case at bar are no greater than in Smith v. Navigation Co. This was later than McLean v. Fleming, and the circumstances were more close to those at bar than in the earlier case. Of course, it is not necessary, on the motion at bar, for us to determine that the decision in Smith v. Navigation Co. was correct; but there is enough in it, and enough in the common rules applicable to motions for new trials, to bring us to the conclusion that the question which arises as between the almost absolute improbability of the plaintiffs' case from the defendant's point of view, and the somewhat like improbability of the defendant's case from the plaintiffs' point of view, is one to be solved by a jury, and not by a judge presiding at a common-law trial, either before or after verdict.

One point, not made by counsel, strongly impresses the mind of the court as of some value in determining whether the subordinate officers of the vessel made an error in tallying off the goods which were shipped as and for those of the plaintiffs. It was their duty, with reference both to the interests of the ship and the interests of the shippers, to have avoided mistakes of this character in a distant foreign port, when it was within their power to do so. That it was within it with regard to the merchandise in question is beyond doubt, because it must be assumed that they were sufficiently familiar with the difference between sheepskins, as packed and wrapped for ocean shipment, and goatskins and kidskins, that the slightest observation would have made plain to them whether a deception had been attempted. Such observation ought to have led to an immediate report to Rondino, if there had been a fraud, and, through Rondino, to the shippers or their agent, followed by a speedy detection of the fraud and relief against the same. Must we concede that these officers were guilty of negligence in this respect? Perhaps the court as now constituted attached too much importance to the usual transactions with reference to the receipt of goods shipped in foreign ports; but, however that may be, the case seems to be one which we cannot solve on a motion for new trial.

If the defendant's position on this motion is correct, it must be so because the inferences which arise from its case are so strong that

no evidence of a presumptive character can meet them, so that nothing except direct proof that some fraud was committed after the merchandise was laden aboard the ship could avail the plaintiffs. If such is the fact, it was the duty of this court to have granted the request of the defendant for the instruction to the jury which we have quoted. Therefore, as exception was duly taken in reference thereto, if we are in error in failing to see the force of the defendant's case in this respect, the appellate court can, on well-settled rules, give relief. Schuchardt v. Allens, 1 Wall. 359, 369, 17 L. Ed. 642; Railroad Co. v. Moore, 121 U. S. 558, 569, 7 Sup. Ct. 1334, 30 L. Ed. 1022; Sparf v. U. S., 156 U. S. 51, 99, 100, 15 Sup. Ct. 273, 39 L. Ed. 343; Coughran v. Bigelow, 164 U. S. 301, 307, 17 Sup. Ct. 117, 41 L. Ed. 442; Rainger v. Association, 167 Mass. 109, 110, 44 N. E. 1088.

The defendant's motion for a new trial is denied.

Note by the Court: Harrowing v. Katz, 10 Times Law R. 115, 400, is worth examining in this connection, although, as it is not of so high authority and is less in point than Smith v. Navigation Co. [1896] App. Cas. 70, it was not thought advisable to discuss it in the opinion.